**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | Civil Action No. |
| Plaintiff, | |
| | 1:15-CV-0833(AJT/JFA) |
| ANTHONY GARZIONE | |
| Relator, | |
| v. | |
| PAE GOVERNMENT SERVICES, INC. d/b/a PAE | |
| Defendant. | |

## AMENDED COMPLAINT

Relator Anthony Garzione, by and through undersigned counsel, for his Complaint against defendant, PAE Government Services, Inc. ("PAE"), alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. Section 1331, as Garzione's claims are premised on the Federal Civil False Claims Act, codified at 31 U.S.C. Sections 3729-3733, as set forth herein.

2.     Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C. Section 3732 and 28 U.S.C. Section 1391 as the Defendant resides in this judicial district.

### PARTIES

3.     Plaintiff Anthony Garzione is a former employee of Defendant PAE, where he worked as a Program Subcontracts Manager.

1

4.      Defendant PAE Government Services is a United States Department of State contractor.

## FACTS

5.      PAE employed Garzione as a Program Subcontracts Manager, working on a support contract for the Department of State ("DOS") in Baghdad, Iraq.

6.      Throughout his employment with PAE, Garzione was a successful employee and met PAE's legitimate performance expectations.

*The Prime Contract*

7.      In July 2013, PAE was awarded a contract by DOS to provide life support and logistical function for DOS sites in Iraq.   The contract is an indefinite-delivery, indefinite-quantity ("IDIQ") contract.

8.      This contract is called SAQMMA-13-D-0120 ("Prime Contract").

9.      Under the Prime Contract, PAE supported DOS's mission at the Baghdad Embassy Compound, Camp Condor, Camp Olympia, Embassy Heliport, Baghdad Diplomatic Support Center, and U.S. Consulate General Basrah.

10.     The Prime Contract charged PAE with providing the procurement of food and supplies, storage, preparation, serving, and cleaning of food facilities, among other life support and logistical duties.

11.     As part of the contract, PAE is to provide food services to support Department of State functions in Iraq at a task order level.

12.     The Prime Contract provides that at the task order level, PAE may be paid for or recover direct or indirect costs if consistent with the Federal Acquisition Regulations ("FAR") Part 31.

2

13.     The Prime Contract also provides that supplies' costs were only payable to the extent they represented actual incurred costs that the Contracting Officer determines is allowable under FAR 31.201-2.

14.     FAR 31 requires that direct or indirect costs be reasonable.   A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor.

15.     Under FAR Part 31, "what is reasonable depends upon a variety of considerations and circumstances, including –

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Department of State, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices."

16.     The prime contract provides that PAE may also be paid for indirect costs as part of awarded fixed-price under competitively-awarded fixed-price task orders.

17.     Under the Federal Acquisition Regulations and the Prime Contract, materials directly incorporated in a final purchased product are considered direct costs.

18.     Additionally, the Prime Contract incorporated by reference FAR section 52.244-5.

19.     Federal Acquisition Regulation 52.244-5(a) prescribes that: "The Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract."

20.     The Prime Contract required that PAE submit invoices for payment no later than the 10th day following the last day of the reporting month.

*Bottled Water under the Prime Contract*

21.     At the initiation of the Prime Contract in July 2013, bottled water was supplied separately from other food services and supplies, through the Department of Defense's Defense Logistics Agency ("DLA").

22.     Taylors International Services, Inc. ("Taylors") was the subcontractor of PAE who was awarded the contract to provide food supply in support of the "BAGHDAD LiFE SUPPORT SERVICES" ("BLiSS") under Section B.7 of the Prime Contract.

23.     As part of its provision of food supply under B.7 of the Prime Contract, Taylors provided a relatively small quantity of bottled water, as Taylors also provided a variety of hot and cold beverages as part of its provision of food services.

24.     From July 2013 to around July 2014, the Defense Logistics Agency supplied thousands of cases of bottled water per month.

25.     At some point in 2014, the Defense Logistics Agency determined that it would no longer supply bottled water for BLiSS after around December 31, 2014.

26.     At that point, the Department of State issued a Task Order or contract modification for bottled water to PAE for any bottled water required outside of the DLA supply.

27.     The Task Order was called SAQMMA14F0721.

4

28.     The Task Order specified minimum standards for the water, including the requirement that the water be ordered in units of 12-packs of bottles.

29.     In July or August 2014, PAE's Dubai office issued a request for bids to supply 4,000 bottles of water for testing from potential subcontractors interested in winning the subcontract to provide the water the Defense Logistics Agency had previously supplied.

30.     Garzione was not involved in issuing this request for bids, but in July or August was asked by Taylors's representatives what became of the bidding process.

31.     In July or August 2014, Garzione investigated bottled water supplier options.

32.     Garzione reviewed the bids to supply the 4,000 bottles of water from 9 or so potential suppliers.

33.     The bids were to supply fixed-unit prices for supplying 12-packs of bottled water for 4,000 bottles.

34.     Taylors quoted PAE a price of $3.65 per 12 pack of Pearl brand water.  Pearl quoted $3.50 per 12 pack; and Agility with Innovation ("AWI") quoted a price of $1.18 per 12 pack.

35.     On July 8, 2014, Garzione asked Taylors's official Jamie Williams to give him the price of testing various bottled water options to ensure they complied with the Task Order's minimum specifications, using Taylors laboratory in Iraq.

36.     In response, Williams stated that if Taylors won the award Taylors would test the water for free.

37.     Williams stated that if Taylors was not successful in winning the contract to supply the bottled water, Taylors would charge $1,000 per 10 bottles tested.

38.     In or around September 2014, PAE's Dubai office issued a Notice to Proceed to Taylors International, Inc. ("Taylors") on Task Order SAQMMA14F0721 for the procurement of the bottled water through the end of November 2014.

39.     The Notice to Proceed noted that payments will be made on actual costs that the Department of State determined were allowable pursuant to FAR part 31 and a competitive price competition conducted by Taylors to make its best effort to get volume discounts.

40.     Garzione questioned PAE supervisors and asked why Taylors was chosen as the subcontractor, given that its quoted response to the solicitation was higher than the other suppliers.

41.     PAE supervisors told Garzione that Taylors was simply best suited to receive the contract.

42.     Garzione informed his supervisor that he intended to reissue the competition for bottled water suppliers for the longer-term contract that would apply after November 2014.

43.     In or around September 2014, PAE's Dubai office submitted a response to the DOS's Task Order naming Taylors as the subcontractor that would supply bottled water.

44.     This was done despite lower bids and without any legitimate explanation.

45.     Taylors's price was so significantly higher than other competitors that Taylors's price was not, and could not arguably have been, the best value.

*PAE Overcharges the Department of State for Water from October to December 2014*

46.     On September 30, 2014, Taylors billed PAE for supplying water pursuant to the task order.  On October 16, 2014, Taylors billed PAE for supplying water pursuant to the task order.  On November 11, 2014, Taylors billed PAE; on November 24, Taylors billed PAE; and on November 30, Taylors billed PAE.

47.     Upon information and belief, Taylors continued to submit these invoices for payment after November 2014.

48.     Accordingly, as provided in the Prime Contract, PAE – through Finance Manager Joelle Guy in PAE's Arlington, Virginia office – presented claims to the Department of State for each of these month's invoices by October 10, and November 10, and December 10, and upon information and belief, have presented claims for payment for invoices for months after November 2014 within 10 days of the month for which Taylors billed PAE.

49.     Because PAE knew there were cheaper and better-value bottled water supply options yet continued to charge the Department of State for Taylors higher priced bottled water, PAE intentionally overcharged the Department of State for the bottled water procurement.

*Garzione Seeks to Solicit Competition for Long-Term Bottled Water Contract*

50.     Knowing that the Task Order for Taylors to supply water initially was of limited duration, Garzione continued to solicit prices of other suppliers to share with PAE.

51.     Garzione sought a bid from Taylors for the longer-term contract and was informed that its price was $3.65 per 12-pack, the same price Taylor's quoted to supply just 4,000 bottles of water.

52.     On October 7, 2014, Garzione asked PAE contracts employee Faisal Valappil, copying another PAE employee, Mohammed Faisal, whether PAE could issue a purchase order to Pearl, and whether there were any obstacles for them to performing and delivering the bottled water contract.  Garzione noted that their price was $3.60 per 12-pack of bottles and that it might be lower if given a higher volume award such as the one contemplated in 2015.

53.     Valappil responded and said that it would not be a problem to have Pearl added as a vendor and that they confirmed that they had experience delivering bottled water to the bases and compounds subject to the Task Order.

54.     Valappil wrote that he did not know why the prior Task Order had not been awarded to Pearl.

*Garzione Investigates and Seeks to Stop False Claims*

55.     On October 8, Garzione asked Valappil to seek a bid from Pearl on the longer-term bottled water contract.

56.     Mr. Valappil's supervisor, John Hilker, responded instead, and told Garzione that he needed to seek the bid himself and to ensure that he coordinated with another PAE supervisor, Program Manager Mike Stackpoole.  He copied Stackpoole on the response.

57.     Garzione told Hilker and Stackpoole that the new bid solicitation was necessary "so the Department of State can potentially save millions of dollars each year on water."

58.     Later the next day, on October 8, Garzione told Stackpoole, who had now copied Ken Messner, PAE's Director of Iraq Operations, that there was as issue of cost with the bottled water task order solicitation and that there had been potentially been some breaches of bid protocol.

59.     Garzione explained to Messner and Stackpoole that he believed PAE had awarded the contract through November 30 under pressure to fill the void left by the Defense Logistics Agency stopping deliveries and accordingly, Taylors had been selected since they were the primary subcontractor providing food services.

60.     Garzione told Messner and Stackpoole that after receiving Taylors first two invoices, it was apparent that Taylors's bid did not reflect the total costs, and that the actual cost

was 8.5% higher than Taylors's bid, that Taylor's actual price was $0.16 more expensive per 12 pack than Pearl, and that Pearl perhaps could charge a lower rate if awarded a contract for a greater quantity than their bid to supply 4,000 bottles.

61.     On October 8, Messner responded that he understood Garzione's goal of achieving a lower-cost supply for the longer-term bottled task order.

62.     However, in November 2014, when Garzione sought to determine the feasibility of AWI being awarded the longer-term task order, Messner stated that he did not understand why Garzione wanted to solicit bids for the new task order.

63.     In contrast with his October 2014 statements, now Messner claimed that Taylors position of subcontractor generally responsible for food supply chain meant that Taylors had already been responsible for and awarded the bottled water task order.

64.     This directly contradicted PAE's earlier action in awarding a new task order for the bottled water through November 30, 2014 instead of simply upping the quantity requested under the overall subcontract for the food supply chain.

65.     In that email conversation, Garzione stated that his concern "is competitive sourcing to the maximum extent practicable and evaluating prices, quality, delivery, of competing vendors to ensure fair and reasonable prices."

66.     On December 2, 2014, Garzione arranged for AWI to deliver water for testing to determine if it met the original Task Order's specifications.

67.     On December 3, 2104, Garzione issued a Notice to Proceed to Jamie Williams of Taylors to test AWI's water according to their prior quote for testing water other than their own.

68.     Jamie Williams and Taylors refused to test the water, saying that they would not test another company's water.

69.     Garzione complained to supervisors that Taylors was refusing to cooperate in allowing him to investigate lower-priced options, but PAE supervisors ignored his complaints.

70.     In December 2014, PAE apparently agreed with Taylors that Taylors would supply the bottled water for the long-term, potentially four year contract with additional option years at the $3.65 per 12-pack price.

71.     At those prices, a month supply of bottled water from Taylors is projected to cost the Department of State $315.341.75.   At Pearl's pricing, a month's supply would cost $302,382.50.  A month supply from AWI would cost $101,946.10.

72.     Over the course of the potential four-year contract permitted by Prime Contract, the Department of State will unnecessarily spend an additional $10.2 million dollars on bottled water for BLiSS by paying Taylors instead of AWI.

73.     Over the course of the potential four-year contract permitted by Prime Contract, the Department of State will unnecessarily spend an additional $600,000 dollars on bottled water for BLiSS by paying Taylors instead of Pearl.

74.     PAE did not solicit additional bids from Pearl or AWI for the long-term contract, therefore failing to competitively source that contract at all.

75.     Instead, PAE and Taylors simply increased the quantity Taylors was supplying under the original task order, ignoring the Prime Contract's requirement that PAE charge the Department of State a reasonable price for fixed-unit price costs and supplies' costs, and PAE's own belief that it was required to solicit new bids after learning that the Defense Logistics Agency would no longer supply bottled water for BLiSS.

*Taylors and PAE's Relationship*

76.     Taylors is PAE's largest subcontractor on the BLiSS contract by far.  Taylors and PAE work closely together and it often appears that PAE provides advantages to Taylors that it does not provide other subcontractors.

77.     For instance, under the Prime Contract between PAE and the Department of State and the subcontract between PAE and Taylors, Taylors and PAE can be reimbursed for travel costs under certain conditions.

78.     To be reimbursed, Taylors had to provide PAE, and PAE then had to provide the Department of State, receipts and invoices demonstrating the specific travel and why that travel was a reimbursable cost pursuant to the subcontract and statement of work between Taylors and PAE.

79.     Taylors, however, simply billed PAE $88,000 per month for travel within labor costs.   This violated the subcontract between Taylors and PAE, but PAE did not require compliance by Taylors.

80.     Taylors billed the same $88,000 even when travel restrictions caused by the ISIS invasion of Iraq effectively ended most of the travel of Taylors's employees.

81.     PAE did not object to this practice by Taylors, without a reasonable explanation.

82.     In fact, PAE officers falsely explained in internal communications that Taylors and PAE had negotiated a fixed travel cost, but the subcontract contradicted this claim.

*The Illegal False Claim*

83.     Between October 1 and 10, 2014, November 1 and 10, 2014, and December 1 and 10, 2014, PAE submitted invoices to the Department of State, Contracting Officer Don F. Schlienz at the Office of Acquisition Management, 1701 North Fort Myer Drive, Arlington,

Virginia reflecting the $3.65 per 12 pack prices charged by Taylors, which were significantly higher than AWI's and Pearl's prices.

84.     Following the award of the longer-term contract to Taylors and pursuant to the Prime Contract, upon information and belief, PAE has continued to submit invoices to Department of State, Contracting Officer Don F. Schlienz at the Office of Acquisition Management, 1701 North Fort Myer Drive, Arlington, Virginia reflecting the $3.65 per 12 pack prices charged by Taylors, by the tenth of each month since November 2014, both before and after Mr. Garzione's termination.

85.     In order to be entitled to receive reimbursements for materials such as bottled water under a task order pursuant to the Prime Contract, PAE must comply with FAR Part 31, which requires that supplies' cost be reasonable.

86.     The $3.65 price per 12-pack, multiplied by the thousands of packs of water bought each month, was objectively unreasonable and was not a product of arms length negotiation.

87.     In presenting claims to the Department of State, Contracting Officer Don F. Schlienz, for payment for the bottled water for which Taylors had invoiced PAE, PAE falsely certified entitlement to pay under the Prime Contract, which required that the bottled water have a reasonable price.

88.     PAE knowingly and intentionally falsely represented their compliance with Part 31 of FAR as incorporated in the Prime Contract, and sought and were able to wrongfully overcharge the Department of State for bottled water, allowing both Taylors and PAE to receive greater compensation under the task order and Prime Contract.

89.     The Prime Contract also incorporates Federal Acquisition Regulation 52.244-5(a) prescribes that: "The Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract."

90.     As such, PAE was contractually obligated to engage in a competitive selection process.

91.     By failing to engage in the competitive process, in spite of pressure to do so from Garzione and when it was practical to do so, PAE knowingly violated the Prime Contract and overcharged the Department of State for bottled water.

92.     In refusing to select the bottled water subcontractor on a competitive basis, PAE knowingly presented a false claim to the Department of State constituting a false statement for payment in violation of the False Claims Act.

93.     The Department of State relied on PAE's false statements in paying the price charged by PAE.

94.     PAE's false certification that the bottled water procurement was competitively-sourced was material to the Department of State's decision to pay PAE's claims for payment for the bottled water procurement, because it had a natural tendency to influence the Department of State to pay for the procurement by encouraging the Department of State to believe the bottled water was as cheap as possible while meeting the procurement's standards.

95.     PAE's false certification that it awarded the bottled water task order on a competitive basis, and false certification that the price charged was reasonable, and omission that significantly less-expensive bottled water was available from other suppliers, was material to the Department of State's decision to pay PAE under the Prime Contract.

96.     Common sense indicates that the Department of State would not have agreed to pay the claims for payment for water had the Department of State known that PAE was charging significantly more than other sufficient and available options.

97.     PAE's decision to remove Garzione's responsibilities and terminate him in the months after he attempted to end the over-priced subcontract with Taylors also suggest that PAE's false certifications were material in PAE's opinion, as PAE went out of its way to silence Garzione.

98.     PAE had presented these false claims with the intent of misleading the Department of State each time it has presented a claim for payment for the bottled water procurement, intentionally misrepresenting that the procurement was competitively-sourced in compliance with their contractual and regulatory obligations.

99.     As a result of PAE's false certifications, PAE presented false claims to the Department of State for payment.

*PAE Retaliations Against Garzione for Investigating and Acting to Stop False Claims*

100.    After PAE awarded Taylors the initial task order to supply bottled water in around September 2014 despite Taylors quoting a higher price than other prospective supplies, Garzione questioned supervisors about the decision to award Taylors the subcontract.

101.    In early October 2014, Garzione reviewed Taylors's first two invoices, which were significantly higher than other options he had priced and significantly higher than the bid Taylors's had originally submitted.

102.    On October 8, 2014, Garzione emailed PAE supervisors and colleagues, including Faisal Valappil, Ken Messner, Michael Stackpoole, John Hilker, Burgess Newsom, Peter Capwell, and Nicholas Price to explain that Taylors pricing appeared higher than other options.

14

103.    Garzione also explained that he believed PAE failed to follow appropriate contractual provisions and regulations by granting Taylors the subcontract award without pricing other options.

104.    Garzione told Messner and Stackpoole that after receiving Taylors first two invoices, it was apparent that Taylors bid did not reflect the total costs, and that the actual cost was 8.5% higher than Taylors's bid, that Taylor's actual price was $0.16 more expensive per 12 pack than Pearl, and that Pearl perhaps could charge a lower rate if awarded a contract for a greater quantity than their bid to supply 4,000.

105.    On October 8, 2014, Garzione told Hilker and Stackpoole that the new bid solicitation was necessary "so the Department of State can potentially save millions of dollars each year on water."

106.    On November 19, 2014, Garzione arranged to have bottled water from AWI tested to confirm that it met the bottled water procurement's standards.  Garzione explained that AWI could provide the Department of State significant saving over Taylors.

107.    Ken Messner responded to an email chain arranging to have AWI's water tested by stating that Taylors had already been awarded the food and beverage subcontract, and that even though PAE originally sought bids to provide a new, and much greater bottled water procurement, that PAE was required to award this new procurement to Taylors as part of the general food supply task order.  This was false.

108.    On December 3, 2014, AWI sent PAE bottled water samples for testing.

109.    On December 3, 2014, Garzione asked Taylors to test the AWI samples for compliance with the bottled water procurement standards, pursuant to Taylors's bid to test water brands in July 2014.

110.   Taylors refused to test AWI's product, claiming that AWI was a competitor with Taylors.

111.   Throughout October, November, and December 2014, Garzione repeatedly told supervisors that the award to Taylors was causing the Department of State to pay more for the bottled water procurement than the Department of State should.

112.   Throughout October, November, and December 2014, Garzione repeatedly complained to supervisors that awarding the bottled water procurement to Taylors without considering competitors' prices violated PAE's contractual obligations to the Department of State and Federal Acquisition Regulations.

113.   Additionally, Garzione sought to gather information to prove that the award to Taylors's violated PAE's contractual obligations to the Department of State and therefore led to false claims when invoices were submitted, by affirming that Pearl could provide the water at the necessary locations and that AWI's water met the specifications of the Task Order.

114.   In acting to investigate and stop the false certifications of compliance with the requirement that the bottled water be competitively-sourced and reasonably priced, Garzione in good faith, subjectively and objectively reasonably believed that PAE's award of the bottled water task order to Taylors led to the submission of false claims for payment to the Department of State.

115.   PAE supervisors, including Mike Stackpoole and Ken Messner, were aware of Garzione's efforts to stop the Department of State's continued payment to PAE and ultimately Taylors; of Garzione's allegations that awarding the task order to Taylors without competition violated PAE's contractual obligations and resulted in the Department of State being potentially

overcharged by "millions," and Garzione's attempt to gather information to prove Taylors's competitors could provide adequate water at cheaper prices.

116.    Each of Garzione's actions in furtherance of a potential False Claims Act claim were lawful.

117.    Stackpoole and Messner were copied on the emails and had oral conversations with Garzione regarding his efforts to investigate and stop the Department of State's payment to PAE and ultimately Taylors.

118.    While Garzione did not use the word "fraud," PAE supervisors were on notice that Garzione's efforts were designed to investigate and stop PAE's potential fraudulent claims on the Department of State, and that there was a distinct possibility of Garzione bringing a False Claims Act claim if PAE continued to seek payment from the Department of State under Taylors's prior bid.   Garzione informed supervisors that PAE was violating its contractual obligation to compete the contract; that Taylors's bid was false when compared with what they actually charged; that PAE and Taylors violated bidding protocols; and repeatedly stated the Department of State was being wrongfully overcharged, perhaps by millions of dollars.

119.    After Garzione's complaints and efforts to investigate and stop the payments to PAE from the Department of State in the fall of 2014, PAE supervisors, including Mike Stackpoole and Ken Messner began treating Garzione with extreme hostility, demanding that he not interfere with the bottled water contract or other contracts.

120.    Additionally, Stackpoole screamed at Garzione in several conversations.

121.    Garzione reported this abusive behavior to PAE supervisors, but they refused to address it.

122.    In December 2014, Stackpoole and Messner, along with other PAE supervisors, began to exclude Garzione from meetings and communications that he was required to attend or receive.

123.    Also, in December 2014, PAE supervisors removed Garzione's responsibilities and oversight over several contracts and precluded him from performing his job.

124.    On February 4, 2015, PAE terminated Garzione's employment without an accurate reason.   In justifying the termination, PAE supervisors cited incorrect subjective evaluations of Garzione's performance.   When Garzione asked for specific instances of poor performance, supervisors were unable to specify individual instances of poor performance.

125.    In truth, PAE terminated Garzione because he acted to investigate, stop, and potentially litigate a False Claims Act, and acted in furtherance of that objective.

## CAUSES OF ACTION

### COUNT ONE
### FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A)

126.    Relator incorporates by reference every allegation.

127.    As part of its contract with the Department of State and the Federal procurement process, Defendant PAE filed false certifications that it competitively-sourced the bottled water procurement it granted to subcontractor Taylors and that the costs it charged the Department of State complied with FAR Part 31.

128.    Defendant PAE knowingly violated 31 U.S.C. § 3729(a)(1)(A) by falsely certifying to the Department of State that it complied with the requirements of its contract with the Department of State and Federal Acquisition Regulations.

129.    Defendant PAE knowingly violated 31 U.S.C. § 3729(a)(1)(A) by causing to be presented, a false or fraudulent claim for payment or approval.

130.    PAE's knowing violations of 31 U.S.C. § 3729(a)(1)(A) caused, and continued to cause the Department of State to pay more for bottled water under the contract than it otherwise would.

## COUNT TWO
## FALSE CLAIMS ACT – MAKING OR USING FALSE
## RECORDS OR STATEMENT TO CAUSE CLAIM TO BE PAID
## 31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A)

131.    Relator incorporates by reference every allegation.

132.    Defendant PAE and their agents and employees knowingly and with reckless disregard for the truth made, used, and/or caused to be made or used false statements, claims, and records material for payment from the United States that included claims and charges for the bottled water procurement that did not comply with PAE's contract's and Federal Acquisition Regulation's requirement that such procurement and subcontract be competitively-sourced.

## COUNT THREE
## RETALIATION
## [31 U.S.C. Sections 3729-3733]

133.    Plaintiff re-alleges every allegation.

134.    PAE's has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section, or who act to stop violations of the False Claims Act.

135.    Plaintiff took lawful actions in furtherance of a False Claims Act action, including investigation for a potential action to be filed under this section and attempted to stop a violation

of this section and, as such, engaged in protected activity under the False Claims Act and other laws.

136.    Defendant knew or should have known that Plaintiff's activities investigating and opposing their unlawful conduct, including his investigation for, testimony for, or assistance in an action filed under this section, were in connection with a potential False Claims Act action.

137.    Defendant retaliated against Plaintiff for his lawful actions taken in furtherance of a False Claims Act action, including but not limited to her investigation and efforts to prevent further False Claims Act violations by Defendant.

138.    As a result of his reporting of Defendant's False Claims Act violations to management, Defendant terminated Plaintiff on February 4, 2015 in violation of 31 U.S.C. § 3730(h).

139.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

140.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

141.    In acting as alleged above, Defendant acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive

amounting to malice, and in conscious disregard of Plaintiff's rights.   Plaintiff is entitled to recover punitive damages from Defendants in amounts to be proved at trial.

## JURY DEMAND

142.   Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Relator/Plaintiff, Anthony Garzione, prays for the following relief:

a.   Defendant be enjoined from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and from concealing, removing, encumbering, or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court.

b.   The Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant for each violation of 31 U.S.C. § 3729.

c.   Relator be awarded the maximum allowed pursuant to 31 U.S.C. § 3730.

d.   Relator be awarded all costs and expenses of this action, including attorneys' fees pursuant to 31 U.S.C. § 3729.

e.   Back pay;

f.   Front pay;

g.   Compensatory damages;

h.   Punitive damages;

i.   Reasonable attorneys' fees and court cost associated with this suit;

j.   Awarding prejudgment interest, costs and disbursement as appropriate herein; and

k.   Other such relief as may be appropriate to effectuate the purposes of 28 U.S.C. Section 3729 and 3730, and as this Court and jury deems equitable, appropriate, and just.

21

Respectfully Submitted,


/s/
_____
Jack B. Jarrett
Va. Bar # 86176
Attorney for Anthony Garzione
The Spiggle Law Firm, PLLC
4830B 31st St., S.
Arlington, Virginia 22206
(202) 449-8527 (phone)
(202) 540-8018 (fax)
jjarrett@spigglelaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 8, 2015, I filed the foregoing with the Clerk of

Court using the Court's CM/ECF system, which will send a notification of such filing to each

counsel of record in this matter and on:

Richard W. Sponseller
Assistant U.S. Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314


Respectfully Submitted,

/s/
_____
Jack Jarrett (VSB #86176)
Attorney for Plaintiffs
The Spiggle Law Firm, PLLC
4830B 31st St., S.
Arlington, Virginia 22206
(202) 499-6975 (phone)
(202) 540-8018 (fax)
jjarrett@spigglelaw.com