| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF VIRGINIA |
| 2 | ALEXANDRIA DIVISION |

```
UNITED STATES OF AMERICA,     )   Case 1:15-cv-00833
                              )
           Plaintiff,         )
                              )
ANTHONY GARZIONE,             )
                              )
           Relator,           )
                              )
      v.                      )   Alexandria, Virginia
                              )   January 22, 2016
PAE GOVERNMENT SERVICES       )   9:54 a.m.
INC.,                         )
                              )
           Defendant.         )
_____)   Pages 1 - 25
```

TRANSCRIPT OF DEFENDANT'S MOTION TO DISMISS AMENDED

COMPLAINT PURSUANT TO RULE 12(b)(6) AND 9(b)

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Rhonda  F.  Montgomery    OCR-USDC/EDVA    (703) 299-4599

```
 1   APPEARANCES:

 2   FOR THE RELATOR:

 3         JACK B. JARRETT, III, ESQUIRE
           THE SPIGGLE LAW FIRM, PLLC
 4         4830-B 31st Street, S
           Arlington, Virginia  22206
 5         (202) 449-8527

 6   FOR THE DEFENDANT:

 7         JASON N. WORKMASTER, ESQUIRE
           JOHN SORRENTI, ESQUIRE
 8         MCKENNA, LONG & ALDRIDGE, LLP
           1900 K Street, N.W.
 9         Washington, D.C.  20006
           (202) 496-7500
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE CLERK:  Civil Action 1:15-cv-833, *Anthony*
2  *Garzione v. PAE Government Services, Inc.*
3              MR. JARRETT:  Good morning, Your Honor.  Jack
4  Jarrett for Relator Anthony Garzione.
5              MR. WORKMASTER:  Good morning, Your Honor.
6  Jason Workmaster with my colleague, John Sorrenti, for
7  PAE.
8              THE COURT:  All right.  We're here on a
9  motion to dismiss the amended complaint.  I've reviewed
10 the briefing in the case.  I'll give counsel an
11 opportunity to explain what they think they need to
12 more adequately explain.
13             MR. WORKMASTER:  Thank you, Your Honor.  May
14 it please the Court.
15             THE COURT:  Yes.
16             MR. WORKMASTER:  Your Honor, the relator's
17 amended complaint here does not identify a single
18 invoice that our client submitted to the government
19 that was false on its face, does not identify a single
20 statement that our client made to the government
21 regarding its compliance with the Federal Acquisition
22 Regulation.  And so he relies entirely on this implied
23 certification theory of liability of which I'm sure the
24 Court is well aware.
25             THE COURT:  Let me just ask a preliminary

1   question.

2          MR. WORKMASTER:  Yes, Your Honor.

3          THE COURT:  I'm unclear on an aspect of the

4   facts.  I know we're proceeding on the basis of the

5   allegations, but the allegations of the complaint

6   allege that the government gave PAE a prime contract

7   and then modified that contract to include the bottled

8   water supplies after the government decided to stop

9   doing that.

10         MR. WORKMASTER:  Yes, Your Honor.

11         THE COURT:  That modification, at least based

12  on the one exhibit that was submitted, was for water

13  supplies through November 2014.  Was there a subsequent

14  modification for the period after November 2014?

15         MR. WORKMASTER:  The government did, Your

16  Honor, take contractual action.  Whether it was to

17  another mod or another task order, I'm not quite sure,

18  Your Honor, but it did take contractual action to

19  extend that requirement, yes, Your Honor.

20         THE COURT:  The notice to proceed that was

21  given to Taylors was within the context of the

22  modification to the prime contract that extended only

23  through the end of November; is that accurate or not?

24         MR. WORKMASTER:  I believe that's accurate,

25  Your Honor.  I'd have to confirm that, but I believe

1   that's accurate.

2           THE COURT:  So to the extent that there was

3   a -- I guess it's just not in the record what direction

4   PAE gave to Taylors with respect to the period after

5   November 2014.  Was there a second notice to proceed

6   under a second modification to the prime contract?

7           MR. WORKMASTER:  That is not in the record,

8   Your Honor.  My understanding of that is that there was

9   a subsequent action, a subsequent action that PAE took

10  with Taylors.  Taylors, as I believe we noted in our

11  papers, was an existing subcontractor.  They weren't

12  retained just for this bottled water requirement.  They

13  had been a subcontractor working for PAE under this

14  contract for some time.

15          THE COURT:  Right.

16          MR. WORKMASTER:  So whether there was a mod

17  to their underlying subcontract or a separate notice to

18  proceed, I'd have to check on that, Your Honor.

19          THE COURT:  Well, the reason I raise it is

20  because one of your arguments is this is simply an

21  increase in the volume of a previously awarded contract

22  to Taylors, but the notice to proceed, if you consider

23  that to be a separately awarded contract, was really

24  within the context of the mod that expired the end of

25  November.  So they weren't increasing the volume under

1  that mod; were they?

2       MR. WORKMASTER:  May I confer with my

3  colleague for a moment?

4       THE COURT:  Yes.

5     (Counsel confer.)

6       MR. WORKMASTER:  Yes, Your Honor.  As I said

7  before, what our understanding of the facts is, Your

8  Honor, is that that expanded requirement was wrapped

9  into their underlying subcontract that they had already

10 had.

11      THE COURT:  With Taylors?

12      MR. WORKMASTER:  With Taylors, yes, Your

13 Honor.

14      THE COURT:  All right.

15      MR. WORKMASTER:  As we noted in our papers,

16 Your Honor, with respect to that longer term

17 requirement, even if the full panoply of regulations

18 that the FAR imposes on conducting a competition, even

19 if those apply, it is perfectly appropriate for PAE to

20 rely upon recently obtained pricing.  The short-term

21 award had been completed just a couple of months

22 before.  They had received pricing.  They had received

23 data from nine bidders.  Under the FAR Part 15 of the

24 provision that we cite, FAR 15.403-1, to constitute

25 adequate price competition, you can rely on recent

1   pricing.

2          THE COURT:  Now, as alleged by the plaintiff,

3   Taylors was already supplying limited supplies of water

4   under its original contract.  Is that right?

5          MR. WORKMASTER:  Yes, Your Honor.

6          THE COURT:  All right.

7          MR. WORKMASTER:  Also, as we noted in our

8   papers, the relator is arguing -- appears to be arguing

9   that this award wasn't proper simply on the basis of

10  price.  As we noted in our motion and in our reply

11  brief, the relator concedes that the other -- it does

12  not even allege in his complaint that the other

13  bidders, AWI or Pearl, could meet all of the other

14  requirements, in particular the testing requirement

15  that was imposed by the government for this

16  requirement.

17         It was perfectly appropriate for PAE to take

18  schedule into account.  They already had Taylors under

19  contract.  It was perfectly appropriate to take that

20  into account in making the award as the relator notes

21  PAE did in paragraph 59 of the amended complaint.  It

22  was perfectly appropriate for PAE to take into account

23  that Taylors could meet the testing requirement.  The

24  others couldn't as the plaintiff concedes.  In order to

25  test the water for these other bidders, they would had

1  to have gone to Taylors at $1,000 for a ten-pack test.

2       So there were bases upon which to make this

3  award separate and independent from the pricing that

4  was perfectly appropriate in conducting a competition

5  to take effect of the language that they're citing to

6  the maximum practical extent.  That gives the prime

7  contractor a lot of discretion in deciding exactly how

8  to make award of a subcontract.

9       You know, as we also noted in our papers,

10 Your Honor, you know, the facts as alleged do not

11 demonstrate a violation of this 52.244-5 provision at

12 all.  Again, even under the relator's implied

13 certification theory of liability, he has to identify a

14 violation of something.  He hasn't identified a

15 violation of that, of 52.244-5.  And because there's no

16 violation of 52.244-5, there also, Your Honor, is no

17 violation of the other provisions he cites.  Having --

18       THE COURT:  Are you in agreement that PAE

19 was -- I know they had some competitive bidding, but

20 were they, in fact, required to do that given the fact

21 that Taylors was already a subcontractor?

22       MR. WORKMASTER:  Your Honor, we would not

23 concede that.  We would not concede that.

24       Again, as we noted, this provision of

25 conducting a competition to the maximum extent

1  practical, there's not even been a case that's defined

2  at any point in time exactly what that means.  And so

3  in this case, Your Honor, to grant our motion to

4  dismiss, all the Court needs to find is that our

5  position on 52.244-5 and the other Part 31 provisions

6  he cites -- all the Court needs to find is that our

7  position is a reasonable one.

8           If our position is a reasonable one, PAE

9  could not have acted with the requisite *scienter* for a

10  False Claims Act violation.  At most, at most, this

11  would be a contract violation.  And figuring out

12  exactly what 52.244-5 and 31.201-2 and 3 mean in this

13  context, that could be left for a contract case between

14  the government and PAE -- of course, the government

15  hasn't brought any such case against us -- for a

16  resolution in the Court of Federal Claims or one of the

17  boards of contract appeal.  That is not an issue that

18  this Court even needs to resolve with finality to grant

19  our motion.  It is simply enough to find that we acted

20  reasonably and, therefore, could not possibly have had

21  the *scienter*.

22           THE COURT:  Why don't you speak to the

23  retaliation claim.

24           MR. WORKMASTER:  On the retaliation claim,

25  Your Honor, it's simply what we have said in our

1   papers.

2           THE COURT:  Your position is really this is a

3   *Keckler* case where there was no objective reason to

4   think there was fraud.  So no matter how much he

5   investigated, he couldn't be retaliated.

6           MR. WORKMASTER:  That is absolutely correct,

7   Your Honor.  Even taking the facts that Mr. Garzione

8   has alleged as true, it adds up to he was complaining

9   about a potential -- something he thought was a

10  contractual problem that was not nearly enough to put

11  PAE on notice that he was about to sue them for fraud;

12  therefore, there could not have been any retaliation

13  against him, Your Honor.

14          THE COURT:  Well, I'm looking at the

15  allegations of paragraph 118 which says, "Garzione

16  informed supervisors that PAE was violating its

17  contractual obligation to compete the contract; that

18  Taylors's bid was false when compared with what they

19  actually charged; that PAE and Taylors violated bidding

20  protocols; and repeatedly stated the Department of

21  State was being wrongfully overcharged, perhaps by

22  millions of dollars."  What's inadequate about that

23  allegation?  Obviously, you don't agree with it.

24  Accepting it as true, what is inadequate about that?

25          MR. WORKMASTER:  Well, Your Honor, it in no

1  way indicates -- would have indicated to PAE that this

2  was anything beyond simply an employee who had a

3  concern about a contractual violation.

4          THE COURT:  In your view, it has to be

5  construed within the context of the underlying conduct

6  by PAE?

7          MR. WORKMASTER:  Absolutely, Your Honor.

8  Absolutely.  It was not nearly enough to put us on

9  notice that Mr. Garzione was about to sue us.

10          THE COURT:  All right.

11          MR. WORKMASTER:  Thank you, Your Honor.

12          THE COURT:  Counsel.

13          MR. JARRETT:  Good morning, Your Honor.  May

14  it please the Court.

15          THE COURT:  Good morning.

16          MR. JARRETT:  We agree with PAE's counsel,

17  that the key issue in this case is whether PAE's

18  contention that it reasonably believed it was awarding

19  the subcontract to Taylors the best value.  If that

20  contention is correct or if our contention that

21  Mr. Garzione's allegations amount to -- that must be

22  taken as true amount to the assertion that PAE was

23  intentionally overcharging the government and, in doing

24  so, knowingly certifying falsely compliance with the

25  prime contractor.

1          THE COURT:  Well, that's what I'd like you to

2 focus on.  As I understand your theory, it's an implied

3 certification theory, correct?

4          MR. JARRETT:  Yes, Your Honor.

5          THE COURT:  What specifically were they

6 impliedly certifying?

7          MR. JARRETT:  They were certifying -- as the

8 papers lay out, there's a short-term and a long-term

9 contract.  They were certifying that the prices they

10 were charging the government were reasonable under

11 the --

12          THE COURT:  Well, talk a little bit more

13 about that.  Under Part 31, they're entitled to be paid

14 their actual cost and the cost that the contracting

15 officer determines to be reasonable, correct?

16          MR. JARRETT:  Yes, sir.

17          THE COURT:  So there's no express

18 certification they they've complied with anything, but

19 your theory is that they impliedly were certifying

20 compliance with Part 31?

21          MR. JARRETT:  Yes.

22          THE COURT:  All right.  How do you construe

23 an implied certification within the context of Part 31?

24 I can see where there's an implied representation that

25 you're billing actual cost, but how are you impliedly

1  certifying given the language of Part 31 which

2  centrally says the government will pay whatever costs

3  are reasonable?  It doesn't say that the contractor is

4  only submitting actual and reasonable costs.  It says

5  it's submitting actual cost and the government will pay

6  those costs to the extent the government determines

7  them to be reasonable.  So how does your implied

8  certification theory include an affirmative

9  certification that the actual costs they're submitting

10 is, quote, reasonable?

11        MR. JARRETT:  In submitting these claims for

12 payment, they're submitting that they are in compliance

13 with FAR Part 31 and FAR 52, the competition

14 requirement.  In saying that we are eligible to receive

15 payment, they are saying that the prices we're charging

16 are reasonable.

17        This is like the *Triple Canopy* case in which

18 they're saying -- they're submitting claims for payment

19 for these guards, in so doing, saying these guards

20 comply with our contractual obligations.  What was

21 false about that in that case was that the guards

22 weren't meeting the requirements.  In the same way, PAE

23 is certifying that we're entitled to payment because

24 we've complied with our prime contractual duties in

25 selecting subcontractors and charging a reasonable

1   price.

2           THE COURT:  All right.  Let me pick up on

3   that last point.  I understand that PAE, in fact,

4   competitively sourced the bottle requirement, but there

5   was already in place a prime contract to PAE.  Then PAE

6   subcontracted Taylors for food supplies which included

7   beverages and, by your own allegations, including some

8   water.  I know they did it, but why were they obligated

9   to competitively bid an increase in Taylors' water

10  obligations under its existing subcontract?  Why

11  couldn't that have just been done by way of a notice to

12  proceed or a sub-task order or however you want to

13  characterize it?

14          MR. JARRETT:  Your Honor, we believe that the

15  requirements of the prime contract when there's a new

16  task order that's so different than the original -- the

17  water supply under just a regular food supplier was a

18  nominal supply as compared with this Defense Logistics

19  Agency.

20          THE COURT:  Well, could some competing

21  contractor have protested the modification to PAE's

22  contract on the grounds that the government had an

23  obligation to competitively bid the prime contract for

24  the water?

25          MR. JARRETT:  No, Your Honor.

1              THE COURT:  There was no competition as to an

2    expansion of the prime contract; was there?

3              MR. JARRETT:  Your Honor, I'm not aware that

4    there was.

5              THE COURT:  Nor was there a requirement that

6    that be done?

7              MR. JARRETT:  I believe that was within the

8    prime contract's provision, that PAE was the prime

9    contractor to provide food and life services.

10             THE COURT:  But they weren't providing water?

11             MR. JARRETT:  PAE was not providing the

12   entire water supply.

13             THE COURT:  Correct.  They were providing a

14   little bit of water the way Taylors was providing a

15   little bit of the water?

16             MR. JARRETT:  Yes, Your Honor.

17             THE COURT:  All right.  So when PAE's

18   obligation to increase water was established -- and the

19   government did that on a noncompetitive basis -- why

20   would PAE have an obligation to competitively bid an

21   increase in what Taylors was already doing under its

22   existing subcontract?

23             MR. JARRETT:  Because the prime contract with

24   PAE provides that they only receive costs to the extent

25   those costs are reasonable and that --

1          THE COURT:  That's a different point.

2    Reasonableness is a different point.  I'm talking about

3    the competitive bid point that you've raised, which is

4    FAR 52.

5          MR. JARRETT:  Yes, Your Honor.  The prime

6    contract also provided that when PAE was granted the

7    award by the government, the government elected to ask

8    for more water from PAE.  The government is involved in

9    that decision.  They say, PAE, you're our agent in

10   finding -- as the prime contractor, you're our agent in

11   finding more water.  One of the protections that the

12   government presents itself when it has these prime

13   contracts is to say, You need to competitively source,

14   and that was a requirement within the prime contract.

15         THE COURT:  Well, they competitively bid,

16   presumably, the prime contract to Taylors in the first

17   instance, correct?

18         MR. JARRETT:  Yes, Your Honor.  I think this

19   is key and this is what differentiates this case from

20   just a person coming in and disagreeing about a

21   contractual provision or two reasonable interpretations

22   of a contractual provision.  I think this is what

23   differentiates this case from that, that is that PAE

24   has not told -- has not given a consistent explanation

25   for why -- for either its obligations under the prime

1  contract or why it awarded either of the short-term or

2  long-term awards to Taylors.

3        At first, in the summer of 2014, Taylors

4  acted with a reading of the provision that it had to

5  compete it, and it did that.  When Mr. Garzione said,

6  We need to get cheaper prices for the long-term

7  contract, supervisors said, That makes sense to us.

8  Not once during that time -- the argument that Taylors

9  was the best value, Taylors didn't bring that up at

10 that point.  They didn't say, No, we don't -- Taylors

11 is the best value.  We don't need to compete this.  Two

12 months later, they completely reversed course, and they

13 said -- they stopped -- Mr. Garzione provides all of

14 this information showing there's cheaper options out

15 there.  They said, Well, we can't compete this because

16 Taylors is our primary food supplier.  We're

17 contractually obligated.

18        THE COURT:  Was the Pearl bid 5 cents or

19 15 cents less than PAE's?  Because at one point it's

20 alleged that it was $3.50 for 12 bottles, and later

21 it's alleged it was $3.65.

22        MR. JARRETT:  I believe it was $3.60 at -- I

23 think the bid may have been $3.50, and then the

24 pricing -- I think when they went for the long-term

25 contract, it may have been $3.60 and $3.65 or the

1  reverse of that.

2          THE COURT:  All right.

3          MR. JARRETT:  Your Honor, if I may,

4  Taylors -- the first time PAE, excuse me, asserted the

5  idea that Taylors was the best value was in their

6  motion to dismiss.  They argued -- they awarded -- they

7  competed the entire length of the contract, that there

8  wasn't a short-term and long-term award.  Three weeks

9  later in the reply they say, Okay, maybe there was a

10 long-term and short-term award.  Our long-term award

11 was relying on this price data that we just recently

12 compiled.

13         This is what differentiates this case from a

14 normal breach of contract.  If PAE truly had a

15 reasonable and honest belief that Taylors was the best

16 subcontractor to provide the best value, they could

17 have told it.  There would have been information that

18 supported that at the time when Mr. Garzione in

19 fulfilling his job duties is saying, There's all of

20 these cheaper prices out here, there's all of these

21 cheaper prices out here.

22         Certainly, by the time PAE is explaining its

23 actions to its attorneys in their motion to dismiss,

24 they would say, Well, here's why we call this a better

25 value.  Instead, PAE has provided four different

1  explanations.  I think that is a sort of *indicia* of

2  misrepresentations that indicate that the

3  misrepresentations were knowing.

4          If you get to that, if you get to that it's

5  knowing, then the idea that they're in actual

6  compliance or close enough to actual compliance

7  isn't -- now we're saying there are cheaper prices and

8  they're intentionally selecting a higher price.

9          THE COURT:  How does your position differ

10 from the position that they had an obligation to take

11 the lowest facial price?

12         MR. JARRETT:  Your Honor, we believe that the

13 bids were -- as alleged in the amended complaint, were

14 to provide all the services, compliant water, and the

15 water supply.

16         THE COURT:  Doesn't your position necessarily

17 reduce to a position that they had the obligation to

18 pick the lowest price based on the initial round of

19 bidding?

20         MR. JARRETT:  No, Your Honor.  We believe

21 that they had to take the best value.  We believe

22 that --

23         THE COURT:  What's the measure of the best

24 value?

25         MR. JARRETT:  I think that that would be

1  defined by factors such as -- the short answer is I

2  don't know.  It --

3            THE COURT:  That was a judgment PAE needed to

4  make.

5            MR. JARRETT:  Yes, I agree.  I think that the

6  way that they've --

7            THE COURT:  That would include a whole range

8  of considerations, including that Taylors was already

9  logistically in place and all the other issues.

10            MR. JARRETT:  Yes, Your Honor.  I think that

11  if Taylors -- if PAE had said that at any point before

12  their motion to dismiss, that there wouldn't be a claim

13  and this would be a disagreement about breach of

14  contract.  But that's not what happened.  They told

15  four different justifications for why they gave to

16  Taylors and didn't come up with best value until a year

17  later when their attorneys were reviewing the file.  I

18  think that's what differentiates this case.

19            THE COURT:  Isn't there an allegation that

20  when Mr. Garzione first raised it, they said that they

21  were the best choice or something along those lines?

22  They were best suited?  They were best suited for the

23  award?

24            MR. JARRETT:  Yes, Your Honor.

25            THE COURT:  Isn't that essentially saying all

1    the things we're talking about now?

2          MR. JARRETT:  No, Your Honor.  The defendant

3    takes that point and tries to draw an inference from it

4    against Mr. Garzione.  Mr. Garzione, when he approached

5    his supervisors when he first found out about these

6    cheaper prices, said, Well, maybe -- in a somewhat

7    conciliatory manner said, Well, maybe we had to award

8    it for these reasons.  Maybe they were best suited.  I

9    can understand that.  But now that we've got this long

10   four-year contract, I've got all of these cheaper

11   prices.  Let's investigate.  They didn't investigate.

12   Instead, they fired him.

13         THE COURT:  Well, he wasn't a decision maker

14   on this procurement; was he?

15         MR. JARRETT:  No.  I believe he was

16   responsible for gathering the data for the decision

17   maker.

18         THE COURT:  For other people to make.  So he

19   wasn't part of the decision-making process or really

20   was privy to the internal thinking on the underlying

21   award.

22         MR. JARRETT:  I think he was.  No.  I take

23   that back.  I think -- I think he gathered the

24   information, and he informed the decision makers of all

25   of this information, of cheaper prices.  They gave him

1   three inconsistent reasons why they shouldn't take it

2   and then stopped him.

3          THE COURT:  All right.  Anything else?

4          MR. JARRETT:  No, Your Honor.  If you have

5   any questions about materiality, particularity, or

6   retaliation, I'd be happy to answer them, but that's

7   all I've got.

8          THE COURT:  All right.  Thank you.

9          Anything further?

10         MR. WORKMASTER:  Your Honor, the colloquy

11  just now, I think, has confirmed that this case is

12  nothing more than Mr. Garzione's mere subjective

13  disagreements with judgment calls that PAE made.  It's

14  ironic, Your Honor, that Mr. Garzione is taking PAE

15  going above and beyond the requirements of competition

16  to the maximum practical extent.

17         As Your Honor focused us today, Taylors was

18  already under subcontract.  When the government

19  awarded -- when the government expanded PAE's

20  obligations to include this bottled water, there wasn't

21  another competition.  PAE would have been perfectly

22  within its rights to just expand the Taylors

23  subcontract.  They had a judgment call to make there:

24  What is the maximum practical extent -- what is

25  competition to the maximum practical extent when you're

1   trying to supply water to Department of State sites in

2   a desert in Iraq?  That is a relevant consideration

3   that could be taken into account.  They could have

4   turned Taylors on under their existing subcontract at

5   that time.  Instead of doing that, they did go out and

6   had a competition, got nine bids.

7          Your Honor, the short-term issue -- the

8   period of performance for that underlying task order

9   was ending at the end of November.  So what happened

10  after November was that PAE had to go to the government

11  and submit a proposal for the next coming year.  That's

12  when Taylors -- the water requirement was wrapped into

13  everything and wrapped into the Taylors subcontract at

14  that time.  So to clarify that factual question that

15  Your Honor had.

16         On the -- Your Honor, on the question --

17  also, in the discussion that you were having with

18  relator's counsel -- again, this is a case involving

19  mere subjective disagreement, and we're disagreeing

20  over very mushy terms:  What does it mean for there to

21  be a competition to the maximum practical extent?  What

22  does best value mean?  You asked the relator's counsel

23  that question.  He said he doesn't know.

24         So we're here.  Relator has brought this

25  complaint based solely on his mere subjective

1    disagreement.  As Your Honor noted, in the complaint,

2    he acknowledges that during -- while he was still at

3    PAE, he was told, Look, we determined that they were

4    best suited.

5         As Your Honor pointed out, PAE was under

6    no -- they're saying all of this.  PAE was under no

7    obligation at that time to tell Mr. Garzione exactly

8    why that determination had been made.  It is not

9    surprising that it was only until after this case was

10   brought and Mr. Garzione has put us in the position of

11   having to file briefs on this issue, etc., that he's

12   learning more about what he did not know then.  That's

13   not surprising.

14        One legal point, Your Honor.  In the

15   discussion you were having with relator's counsel

16   about, you know, under FAR Part 31 there's no need for

17   a certification, there's also another False Claims Act

18   case out of the Northern District of Illinois.  It is a

19   case that is cited in the *Howard* case, which I believe

20   both parties have discussed, but is a case -- *United*

21   *States ex rel. Watkins v. KBR*.  The Westlaw cite is

22   2015 WL 2455533.  In that case, Your Honor, the

23   district court -- excuse me -- Central District of

24   Illinois, May 22, 2015.  In that case, Your Honor, the

25   district court dismissed or found that FAR Part 31 did

1  not require the contractors to certify compliance, did

2  not require the contractor to certify to reasonableness

3  and, therefore, found that there was no False Claims

4  Act violation.  Your Honor, this case is like that.

5           The relator referred to the *Triple Canopy*

6  case.  This case is nothing like *Triple Canopy*.  That

7  was a case where the allegation was that the government

8  had -- was paying for a marksman who couldn't shoot.

9  That's a very different thing.  There was something --

10 the allegation there was that there was something wrong

11 with the item that was actually being delivered.

12 There's no allegation here there was anything wrong

13 with the water.  It's a mere dispute over a contractual

14 violation that doesn't add up to a False Claims Act

15 case.

16          THE COURT:  All right.  Thank you, Counsel.

17          The Court will take it under advisement.

18 I'll get a decision to you shortly.

19          MR. JARRETT:  Thank you, Your Honor.

20          THE COURT:  Thank you.

                   -----------------------------------

21                    Time:  10:22 a.m.

22     I certify that the foregoing is a true and

23  accurate transcription of my stenographic notes.

24

                              _____
                                        /s/
25                            Rhonda F. Montgomery, CCR, RPR